IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Keith Anthony Jones, | ) | C/A No.: 7:24-6063-JDA-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Spartanburg County Deputies, | ) | |
| Spartanburg County Medical Staff | ) | |
| Personnel, Deputy C. Jackson, | ) | |
| Deputy C. Evangelista, Deputy D. | ) | REPORT AND |
| Littleton, Deputy M. Nix, Deputy | ) | RECOMMENDATION |
| J. Dail, Deputy S. Escobar, Deputy | ) | |
| A. Hardy, Deputy B. Letterman, | ) | |
| Deputy/Sergeant Jon M. Guest, | ) | |
| Medical Director K. White, Medical | ) | |
| Staff RN S. Pealer, Medical Staff | ) | |
| RN Roach, Medical Staff RN C. | ) | |
| Fernandez, Medical Staff RN Luz | ) | |
| Sparveri, Medical Staff RN Jereme | ) | |
| Randall, and Medical Staff RN J. | ) | |
| Neeley, | ) | |
| | ) | |
| Defendants. | ) | |

Keith Anthony Jones ("Plaintiff"), proceeding pro se and in forma

pauperis, sues Spartanburg County Deputies ("Deputies"), Spartanburg

County Medical Staff Personnel ("Medical Personnel"), Deputy C. Jackson

("Deputy Jackson"), Deputy C. Evangelista ("Deputy Evangelista"), Lieutenant

D. Littleton ("Lieutenant Littleton"), Deputy M. Nix ("Deputy Nix"), Deputy J.

Dail ("Deputy Dail"), Deputy S. Escobar ("Deputy Escobar"), Deputy A. Hardy

("Deputy Hardy"), Deputy B. Letterman ("Deputy Letterman"),

Deputy/Sergeant Jon M. Guest ("Sergeant Guest"), Medical Director K. White ("Director White"), Medical Staff RN S. Pealer ("Nurse Pealer"), Medical Staff RN Roach ("Nurse Roach"), Medical Staff RN C. Fernandez ("Nurse Fernandez"), Medical Staff RN L. Sparveri ("Nurse Sparveri"), Medical Staff RN Jereme Randall ("Nurse Randall"), and Medical Staff RN J. Neeley ("Nurse Neeley") (collectively "Defendants"), in their individual and official capacities, asserting claims pursuant to 42 U.S.C. § 1983 for alleged violations of his constitutional rights. [ECF No. 49].[1]

Plaintiff specifically alleges that at the time of his arrest, Deputies Jackson, Hardy, Evangelista, and Escobar ran toward him and told him not to run or move, Deputies Hardy and Evangelista "grab[bed his] arms" and "twisted them behind the back of [his] wheelchair," Deputy Hardy "took hold of [his] arms," Deputy Evangelista "search[ed him] in [his] chair," one of the officers told him to drop the items in his hands, and Deputy Escobar "took his police issued flashlight and hit [his] wrist so hard with inten[ded] malice that he broke and disfigured [his] wrist." *Id.* at 11. He asserts "Officer Hardy

---

[1] The undersigned notes Plaintiff failed to sign the third amended complaint. *See* ECF No. 49 at 26. Although Fed. R. Civ. P. 11(a) provides that "[e]very pleading . . . must be signed . . . by a party personally if the party is unrepresented," and "[t]he court must strike an unsigned paper unless the omission is promptly corrected after being called to . . . the party's attention," it is not necessary to permit Plaintiff additional time to correct this error given the recommendation that the case be dismissed with prejudice.

squeezed his handcuff on [his] wrist so tight that they cut [his] skin." *Id.* at 11–12. He claims he "beg[ged] these officers to [loosen] the handcuffs but they ignore[d his] request." *Id.* at 12. He states the handcuffs were twisted in an awkward way that caused him pain. *Id.* He maintains he "beg[ged]" Deputies Jackson, Hardy, and Evangelista to cuff him in the front or reposition or loosen the handcuffs. *Id.* He indicates they declined to do so and told him to stop complaining. *Id.* He asserts he subsequently asked Deputies Hardy, Jackson, and Evangelista to retrieve a urinal from his motel room so that he could relieve himself and they declined to do so, forcing him to urinate on himself. *Id.* He claims the officers ignored his requests to be seen by emergency medical services ("EMS") at the crime scene. *Id.* He alleges these events transpired between approximately 8:00 PM on December 19, 2022, and 3:00 or 4:00 AM on December 20, 2022, when he was transferred to Spartanburg County Detention Center ("SCDC"). *Id.* He states Deputies Jackson, Escobar, Evangelista, Nix, Dail, and Hardy, Lieutenant Littleton, and Sergeant Guest denied his requests to have the handcuffs loosened and placed in front of him and to be seen by EMS. *Id.*

Plaintiff alleges that from December 19, 2022, to April 19, 2023, he complaint in writing he needed to see a doctor because officers broke his wrist while arresting him. *Id.* at 15. He indicates he was transported to Spartanburg

3

Regional Medical Center on April 19, 2023, for x-rays of his wrist. *Id.* He states he repeatedly requested his x-ray results, and was repeatedly told by Director White and Nurses Pealer, Roach, Fernandez, Sparveri, Neeley, and Randall that his x-rays were negative, that nothing was wrong with his wrist, and that he would have to wait until he was released to have it addressed further. *Id.* at 15–16. He claims that in June 2023, Nurse Pealer informed him that his wrist had been broken and had healed wrong and that he would have to wait until he was released or sent to prison to have it fixed. *Id.* at 16.

Plaintiff seeks the following relief: "[W]ant to be re/broken and set. Estimated amount at $8,000–$14,000 dollars to have wrist re broken and set this is for actual damages to person. Punitive damages estimated at $5,000,000.00." *Id.* at 19.

The case is before the court on cross motions for summary judgment filed by Plaintiff [ECF No. 94] and Defendants.[2] [ECF No. 102]. Plaintiff filed a

---

[2] The motion for summary judgment was filed by all defendants who have been served. Plaintiff was previously warned that Spartanburg County Deputies and Spartanburg County Medical Staff Personnel did not qualify as "person[s]" under § 1983. [ECF No. 9 at 7–8]. Despite this warning, Plaintiff continued to include them among the defendants in the second and third amended complaints. *See* ECF Nos. 19 and 49. However, he did not complete forms USM-285 for them, and they were never served with copies of the summons and complaint despite multiple warnings from the court that they would be dismissed as parties if he failed to provide forms USM-285 for them. *See* ECF Nos. 51 at 1 n.1, 68, 82.

4

motion for summary judgment on July 28, 2025. [ECF No. 94]. Defendants filed a combined motion for summary judgment and response to Plaintiff's motion for summary judgment on August 18, 2025. [ECF No. 102-1]. Because Plaintiff is proceeding pro se, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court advised him of the dismissal procedures and the possible consequences if he failed to respond adequately to Defendants' motion. [ECF No. 103].

On September 4, 2025, Plaintiff filed a motion to voluntarily dismiss the matter without prejudice. [ECF No. 106]. The undersigned issued a text order denying the motion and noting that Plaintiff should either file a motion to dismiss the matter with prejudice or file a timely response to Defendants' motion for summary judgment in accordance with Fed. R. Civ. P. 56. [ECF No. 107]. Plaintiff failed to file a timely response, and on September 24, 2025, the undersigned issued an order directing him to advise the court whether he wished to continue with this case and to file a response to the motion for summary judgment by October 8, 2025. [ECF No. 109]. A review of the docket reveals Plaintiff did not file a response to Defendants' motion for summary judgment and has not communicated with the court since filing his September 4, 2025 motion.

All pretrial proceedings in this case were referred to the undersigned

pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(d) (D.S.C.). Because the motions are dispositive, this report and recommendation is entered for review by the district judge. For the following reasons, the undersigned recommends the district judge dismiss Deputies and Medical Personnel as parties to this action, deny Plaintiff's motion for summary judgment, grant Defendants' motion for summary judgment, and dismiss the case with prejudice.

I.    Factual Background

At the time he filed this case, Plaintiff was a pretrial detainee at SCDC. [ECF No. 1 at 3]. He was subsequently placed in the custody of the South Carolina Department of Corrections after having pled guilty to involuntary manslaughter. [ECF Nos. 57 and 102-6 at 3].

Plaintiff generally alleges some of the defendants used excessive force against him at the time of his arrest, and nearly all the defendants subjected him to cruel and unusual punishment by either denying him medical treatment and an opportunity to use the restroom at the time of or immediately following his arrest, or by failing to adequately address his complaints of right wrist pain during the subsequent period while he was incarcerated at SCDC. [ECF No. 49].

Record evidence indicates that on December 19, 2022, at approximately 7:28 PM, Plaintiff called 911 from the Red Roof Inn at 6765 Pottery Road, Spartanburg, South Carolina, to report his "baby" had been shot. *See* ECF No. 49 at 11; ECF No. 102-9, 864-587-0129. Although the call lasted for seven-and-a-half minutes, Plaintiff stopped communicating with the 911 dispatcher after approximately 15 seconds and could no longer be heard on the line after approximately one minute and fifteen seconds. [ECF No. 102-9, 864-587-0129]. A second 911 dispatcher called the front office of the Red Roof Inn to inquire which room number the call was placed from, and the person who answered the phone confirmed that it was room 105. [ECF No. 102-9, Red Roof Inn].

Deputy Jackson was the first to arrive on the scene at approximately 7:32 PM. [ECF Nos. 49 at 11 and 102-7, C Jackson Bodycam 1 at 19:32]. He entered room 105, observed an adult female, later identified as Venecia Woodruff ("Victim"), lying on the ground with a gunshot wound, and asked if she was "still awake" and if she could hear him. [ECF No. 102-7, C Jackson Bodycam 1 at 19:32]. Deputy Jackson searched room 105 and confirmed that no one else was in the room. *Id.* At 7:33 PM, Deputy Jackson spoke briefly with Plaintiff, who was moving in a wheelchair toward the direction of room 105 and arrived outside the room within one minute. *Id.* at 19:33. Plaintiff stated Victim was his "woman." *Id.* Deputy Jackson instructed Plaintiff to "[s]tay

here," as he walked back into room 105 to check on Victim. *Id.* Instead of remaining outside the room, Plaintiff wheeled himself in the direction of the front office. [ECF No. 49 at 11].

Corporal Brad James and Deputies Evangelista and Alex Wark ("Deputy Wark") approached and entered room 105 at approximately 7:35 PM. [ECF NO. 102-7, James Bodycam at 19:35]. They quickly exited room 105 and began to speak with Karen Franklin ("Witness"), who reported she had witnessed the shooting. *Id.*, Escobar Bodycam 1 at 19:36. Witness identified Plaintiff as the shooter, describing him as a "black guy in a wheelchair." *Id.* At 7:36 PM, Deputy Wark stated he had just passed the black guy in the wheelchair. *Id.* Deputies Wark and Escobar ran in Plaintiff's direction and were joined by Deputy Evangelista. *Id.*, Evangelista Bodycam 2 at 19:36. Upon approaching Plaintiff, they yelled "[h]ands up," and Plaintiff placed his hands in the air and said, "I ain't going nowhere. I swear to God, I ain't going nowhere." *Id.*, Escobar Bodycam 1 at 19:36.

Deputy Evangelista approached Plaintiff's right side and Deputy Wark was on his left side. *Id.* Deputy Wark reached first for Plaintiff's left arm, extending it behind his back, while simultaneously reaching for his right arm. *Id.* Deputy Evangelista guided Plaintiff's right arm toward Deputy Wark, who applied handcuffs. *Id.* Plaintiff did not grimace or voice any complaint as the

handcuffs were being applied. *Id.* Deputies Wark and Evangelista instructed Plaintiff a total of four times to "[d]rop what's in your hands." *Id.* at 19:37. Plaintiff twice stated "[i]t's a stem." *Id.* Deputy Escobar struck Plaintiff's left forearm with his flashlight in a short, quick action. *Id.* Plaintiff did not grimace or voice any complaint of pain when Deputy Escobar struck him with the flashlight. *Id.* Plaintiff dropped the item to the ground.[3] *Id.*, Evangelista Bodycam 2 at 19:37. Deputy Evangelista asked Plaintiff "[d]id you pee yourself" and Plaintiff responded "Yes." *Id.* Plaintiff did not request any assistance in going to the restroom or complain of any pain in his wrist or hand at or immediately after he was placed in handcuffs. *Id.*

In the minutes that followed, Deputy Evangelista moved Plaintiff from the area outside of the motel's office to an area within the line of sight of room 105. *Id.* at ~19:38–19:41. While sitting in this area, Plaintiff inquired about the condition of Victim and cried and moaned mostly unintelligibly, except that he said "[m]y baby's dead" and professed that he had not done anything several times. *Id.* At approximately 7:44 PM, Deputies Hardy and Evangelista, searched Plaintiff's wheelchair. *Id.*, Escobar Bodycam at 19:44; Hardy Bodycam 1 at 19:44. At no point during this period did Plaintiff complain about his hand or wrist. *See id.*

---

[3] Deputies later identify this as a tube, presumably from a crack pipe.

Deputy Evangelista began to question Plaintiff around 7:55 PM regarding how he realized Victim had been shot. *Id.*, Evangelista Bodycam at ~19:55. Plaintiff indicated he discovered Victim when he returned to room 105 and feared he was being targeted because he had recently received a monetary settlement. *Id.* Plaintiff subsequently stopped answering questions. *Id.* at ~19:55–19:59. At approximately 8:00 PM, Deputy Evangelista stated he was going to move Plaintiff to get him out of the cold. *Id.* at ~20:00.

Deputy Evangelista moved Plaintiff to a laundry room and disengaged his bodycam. *Id.*, Littleton Body Cam 2, 20:27. Around 8:28 PM, Lieutenant Littleton entered the laundry room and began to question Plaintiff about Victim's identity. *Id.* at ~20:28. Plaintiff inquired about Victim's condition. *Id.* at ~20:29. Plaintiff did not complain about his wrist or hand while Lieutenant Littleton attempted to question him. *See id.* at ~20:27–20:29.

At approximately 8:50 PM, Deputy Evangelista moved Plaintiff from the laundry room to the parking lot for transport to the Sheriff's Department for questioning. *Id.*, Littleton Bodycam 4 at ~20:50. Deputies Evangelista and Hardy, Lieutenant Littleton, and a female officer searched Plaintiff's wheelchair and found another pipe. *Id.* at ~20:51. As Deputy Evangelista attempted to unlock Plaintiff's handcuffs to reposition them, Plaintiff yelled out in pain, said it hurt, and asked why the handcuffs were so tight. *Id.* at

10

~20:52. However, Plaintiff no longer complained about the handcuffs after they were repositioned to his front. *Id.* at ~20:53.

Deputies Evangelista and Hardy, Lieutenant Littleton, and the female officer moved Plaintiff into a van and secured his wheelchair for transport to the Sheriff's Department. *Id.* Plaintiff did not complain about his wrist or hand while he was being secured in the transport van. *Id.* at ~20:53–20:57.

Plaintiff arrived at the Sheriff's Department and was placed in an interview room by 9:17 PM. *Id.*, Interview at ~21:17. He sat mostly silent with his hands cuffed in front of him for over an hour until Sergeant Guest entered the room at 10:21 PM. *Id.* at ~ 22:21. Sergeant Guest asked Plaintiff a few basic questions and read him his *Miranda* rights. *Id.* at ~22:23–22:25. Plaintiff requested to use the restroom. *Id.* at ~22:25. Sergeant Guest transported Plaintiff to the restroom at 10:25 PM.  *Id.* Plaintiff did not complain about his wrist or hands during this interaction with Sergeant Guest prior to being transported to the restroom. *Id.* at ~22:21–22:25.

Plaintiff returned to the interview room at approximately 10:39 PM and Deputy Hardy resecured his handcuffs in the front. *Id.* at ~22:39. Plaintiff did not complain about his wrist or hand at that time. *Id.* Sergeant Guest presented Plaintiff with a form to sign regarding his rights, and Plaintiff declined to sign it, as he desired to speak with an attorney. *Id.* at ~22:39–22:43.

11

Sergeant Guest told Plaintiff "[t]hat's fine" and left the room at 10:43 PM. *Id.* at ~22:43.

Plaintiff sat mostly in silence for the next two hours. *Id.* at 22:43–December 20, 2022, 00:43. At 12:43 AM on December 20, 2022, a female officer entered the interview room to obtain a DNA sample from Plaintiff. *Id.* at ~00:43. She asked Plaintiff to sign a form. *Id.* at 00:44. Plaintiff signed the form with his right hand and without complaint. *Id.* The female officer returned to the interview room at approximately 12:51 AM to take pictures of Plaintiff and present him with copies of the search warrant. *Id.* at ~00:51. Investigator Hammett entered the interview room at approximately 12:55 AM and informed Plaintiff that he was being charged with murder and possession of a weapon during a violent crime. *Id.* at ~00:55. Plaintiff registered no complaints regarding his wrist and hand to the female officer or Investigator Hammett and did not ask to go to the restroom during that period. *See id.* at ~00:44, 00:51, 00:55.

At 12:56 AM, Deputy Hardy wheeled Plaintiff to an elevator and through a hallway to a parking area. *Id.*, Hardy Bodycam 2 at 00:57. Deputies Hardy and Jackson moved Plaintiff into a van and secured his wheelchair for transport. *Id.* at 00:58, Jackson Bodycam 2 at 00:58. Plaintiff moaned and stated "Oh, God," but he did not complaint about his wrist or hand. *Id.*

Deputy Hardy left the Sheriff's Department at approximately 1:01 AM to transport Plaintiff to SCDC. *Id.,* Hardy Bodycam 2 at 01:01. Deputy Hardy's bodycam remained engaged with the sound on as he drove Plaintiff to SCDC. *Id.* Plaintiff's voice was briefly heard on the video as Deputy Hardy arrived at SCDC around 1:06 AM, but Plaintiff did not state any intelligible words. *Id.* at ~01:06.

An inmate health appraisal was conducted by registered nurse Sonya Arthur ("Nurse Arthur") on December 23, 2022. [ECF No. 113 at 3–6]. Plaintiff reported a history of spinal cord injury and muscle spasms, but he denied wounds or injuries. *Id.* at 4, 5. Nurse Arthur examined Plaintiff and specifically noted normal extremities. *Id.* at 6.

On January 12, 2023, Plaintiff filed an inmate request indicating his hand was hurting from the police hitting him at the time of the arrest and that he thought it was "cracked." *Id.* at 85. Plaintiff sent a second request on January 14, 2023. *Id.* at 86. On January 19, 2023, Nurse Fernandez scheduled Plaintiff for an appointment with Director White. *Id.* at 33.

In an inmate request dated January 24, 2023, Plaintiff wrote:

> I've been here since December 20, 2022 with an out of place wrist that the Spartanburg Officer done when I were arrested. I keep asking for medical help to every nurse that come to Room 17 Pod 4 and all that is said is I'm not medical. My wrist is broken. This will be the last time I will contact medical about this matter next will be a lawyer, my lawyer. I'm in a lot of pain here.

13

*Id.* at 87.

Plaintiff was examined by Director White on January 27, 2023. *Id.* at 33. He reported ongoing hand pain with possible fracture that had occurred 36 days prior. *Id.* at 23. Director White observed no swelling or heat, but indicated Plaintiff had some difficulty propelling his wheelchair and grimaced when using his wrist. *Id.* at 34. She administered two Naproxen tablets and prescribed two Naproxen tablets twice a day for five days. *Id.* Rob E. McDonald, M.D. ("Dr. McDonald"), reviewed Director White's note and concluded no further intervention was needed. *Id.* at 23.

On February 16, 2023, Plaintiff complained of right wrist discomfort and stated his wrist had been broken by the police. *Id.* at 23. Nurse Sparveri prescribed ibuprofen 800 mg twice a day for five days. *Id.* She observed that Plaintiff was able to use his right hand to move his wheelchair. *Id.*

On April 6, 2023, Plaintiff was scheduled for an exam based on his attorney's call requesting that he be examined for a possible broken wrist. *Id.* at 35. Nurse Pealer examined Plaintiff on April 11, 2023, noted no obvious deformity to the hand or wrist, and ordered x-rays. *Id.* at 35.

On April 19, 2023, x-rays of Plaintiff's right wrist showed no acute fracture and focal soft tissue swelling with small calcification and cortical irregularity along the radial aspect of the distal radius. *Id.* at 1–2.

14

Plaintiff sent an inmate request on April 23, 2023, requesting the x-ray results. *Id.* at 88. He sent another inmate request for his x-ray results on May 3, 2023. *Id.* at 89. He said he had fallen in his room that day and reinjured his wrist and was in pain and not receiving medication for spasms. *Id.* On June 10, 2023, Plaintiff prepared an inmate request to personally review his x-ray results. *Id.* at 90.

On July 25, 2023, Plaintiff sent an inmate request stating his wrist was seriously hurting and asking that someone examine it. *Id.* at 91. S. Paz informed Plaintiff that the x-rays showed no problem with his wrist. *Id.*

Plaintiff sent an inmate request on August 2, 2023, stating his wrist was healing incorrectly and hurting day and night. *Id.* at 92. He claimed the problem had started on December 19, 2022, when police hurt his wrist. *Id.* Plaintiff again requested his x-ray results on August 3, 2023, and Maryjane Wells informed him that they were negative. *Id.* at 22.

Plaintiff followed up with an inmate request dated August 4, 2023, requesting that someone "please come see" him about his wrist and claiming it hurt where the police beat him with their batons. *Id.* at 93. S. Paz responded that Plaintiff had been told several times that the x-rays were negative and that there was no fracture. *Id.*

15

In an August 14, 2023 inmate request, Plaintiff reported something was wrong with his wrist, as he was still in pain after eight months. Tr. at 94. T. Mallisham informed Plaintiff that his x-rays were negative and that muscle relaxers had been ordered for him. *Id.*

Plaintiff filed an inmate request on September 24, 2023, stating he was still having problems with his wrist and needed to see a bone specialist. *Id.* at 95. T. Mallisham again informed Plaintiff that the x-rays of his wrist were negative. *Id.*

On September 26, 2023, Nurse Pealer saw Plaintiff in the pod for right wrist pain. *Id.* at 22. She noted Plaintiff had been seen multiple times for the same complaint. *Id.* She observed full range of motion, no pain to touch, and no swelling. *Id.* She again informed Plaintiff that the x-ray results from April had been negative and that he could receive no additional treatment for his wrist while he remained incarcerated. *Id.*

Plaintiff filed an inmate request on October 24, 2023, complaining of severe pain in his wrist and requesting pain medication, an Ace bandage, and to be seen by a doctor. *Id.* at 96. T. Mallisham advised Plaintiff that he was already taking a muscle relaxer, and that pain medication could be purchased at the commissary. *Id.*

On November 21, 2023, Plaintiff complained of right wrist discomfort and was prescribed ibuprofen 800 mg twice a day for five days. *Id.* at 22. Nurse Sparveri instructed Plaintiff to obtain more ibuprofen from the commissary, if needed. *Id.* She noted "[i]nmate observed using wrist he was complaining about when he was wheeling away from deputies desk." *Id.* She also observed that Plaintiff "does have outer part of his wrist bone protruding out." *Id.* Plaintiff again requested to see a bone specialist on November 22, 2023. *Id.* at 35–36.

Plaintiff filed an inmate request on December 8, 2023, requesting assistance with pain in his wrist. *Id.* at 98. Nurse Neeley asked Plaintiff what kind of problems he was having and noted that Plaintiff could purchase pain medication from the commissary. *Id.*

Plaintiff filed inmate requests on January 15 and 24, 2024, noting difficulty with right hand swelling in the morning that caused him difficulty in using it and requesting to see a nurse practitioner immediately. *Id.* at 99, 100. Nurse Neeley advised him that he had already undergone x-rays and been seen for the same complaint many times. *Id.* at 100.

Plaintiff filed an inmate request on February 9, 2024, complaining of morning swelling and pain in his hand and requesting a two-piece uniform due to difficulty getting in and out of his clothes. [ECF No. 94-1 at 16]. Nurse Neeley ordered ibuprofen for pain and requested clarification as to Plaintiff's

need for a two-piece uniform. *Id.* On February 13, 2024, Plaintiff complained of swelling in his hand that kept him awake. *Id.* at 22. [ECF No. 94-1 at 10]. Nurse Neeley advised Plaintiff that he would be seen by a nurse. *Id.*

On March 24, 2024, Plaintiff filed an inmate request for his x-ray results. [ECF No. 94-1 at 13]. Nurse Neeley informed him that there were no changes and that no further treatment was necessary. *Id.*

Plaintiff filed an inmate request on May 28, 2024, claiming his wrist continued to hurt from a fall on May 6, 2024. [ECF No. 113 at 101]. In a June 3, 2024 inmate request, Plaintiff claimed Nurse Pealer had informed him that his wrist needed to be rebroken and put into a cast, that "Mary Jane" had said the same, and that they had told him to wait until he was released to have it addressed. *Id.* at 102. Nurse Neeley responded that Plaintiff had been seen for his complaints and was receiving Naproxen and Nortriptyline for pain. *Id.*

Plaintiff filed an inmate request on June 10, 2024, claiming he needed help with "a lot of pain" in his wrist. *Id.* at 103. Nurse Neeley advised Plaintiff to purchase pain medication from the commissary. *Id.* Plaintiff filed another inmate request the following day, asking to see a bone doctor because his wrist was hurting badly. *Id.* at 104. Nurse Neeley informed him that he had been seen, was taking pain medication, and could see a bone doctor upon release. *Id.*

18

On June 13, 2024, Plaintiff filed an inmate request questioning why he had to wait until he was released to see a bone doctor. *Id.* at 105.

Plaintiff filed an inmate request on June 24, 2024, stating he continued to have a lot of pain and was having difficulty holding a spoon. *Id.* at 106. He was scheduled for a visit with Nurse Sparveri on June 25, 2024. *Id.* at 47.

Plaintiff filed an inmate request on July 9, 2024, stating his wrist was "hurting like crazy" and worsening such that he needed to see a doctor. *Id.* at 107. On July 11, 2024, Plaintiff reported his wrist was "hurting like crazy," his fingers were locking up, and he needed to see a doctor. *Id.* at 49. Nurse Pealer examined Plaintiff on July 11, 2024. *Id.* at 49–50.

In a July 31, 2024 inmate request, Plaintiff stated his bilateral hands were hurting, his fingers were locking up, and he was having difficulty pushing his wheelchair. *Id.* at 108. Plaintiff reported similar complaints on August 2, 2024. *Id.* at 50–51, 119. Melinda Brakels examined Plaintiff. *Id.* at 51.

Plaintiff filed an inmate request on August 3, 2024, requesting help with bilateral hand pain. *Id.* at 109. Nurse Neeley informed Plaintiff that Melinda Brakels had noted in his chart that she had instructed him on the proper way to use a wheelchair to avoid hand cramping. *Id.* Plaintiff filed another inmate request the following day, stating he knew how to use his wheelchair and needed to see a doctor. *Id.* at 110. He was scheduled for an appointment. *Id.* at

55. Plaintiff filed inmate requests on August 8, 12, and 14, 2024, regarding of pain in his hands and questioning why he had not been examined by the nurse. *Id.* at 111–13. Nurse Neeley and M. A. Blanton informed him that he was on a list for the nurse practitioner to see as soon as possible. *Id.*

On August 16, 2024, Plaintiff reported continued issues with his hands worsening since he was seen on August 2. *Id.* at 55. He indicated he had sustained an injury to his wrist. *Id.* Nurse Roach attempted to educate Plaintiff on proper gripping to move his wheelchair, but Plaintiff rejected her effort and demanded a new wheelchair. *Id.* Following the visit, Plaintiff filed an inmate request for help with his hands and was advised that the nurse practitioner had ordered new medication that had not arrived. *Id.* at 114.

Plaintiff filed an inmate request on August 20, 2024, stating he needed to see a doctor about his hands, as the pain woke him, and he could not push his wheelchair. *Id.* at 115. Nurse Neeley responded that Plaintiff was on two medications to help with nerve pain. *Id.* An appointment was scheduled on August 27, 2024, for Plaintiff to be seen on August 29, 2024. *Id.* at 65–66. Plaintiff was examined by Nurse Neeley on that date. *Id.* at 65–66.

Plaintiff filed another inmate request on September 13, 2024, stating his hands hurt from pushing himself around and his right hand hurt from being broken during his arrest. *Id.* at 116. He requested to see a doctor. *Id.*

20

On December 10, 2024, Plaintiff filed an inmate request claiming right wrist pain was shooting up his arm and he needed to see a bone specialist. *Id.* at 117. M. A. Blanton recommended Plaintiff use ibuprofen or Tylenol. *Id.* at 117.

Plaintiff filed an inmate request on January 3, 2025, claiming his right hand was hurting and he could not bend his thumb without it popping. *Id.* at 118. On January 4, 2025, Plaintiff was scheduled to be seen on January 5, 2025. *Id.* at 81–82. Plaintiff filed another inmate request on January 6, 2025, complaining of right hand pain radiating up his arm. *Id.* at 119. M.A. Blanton asked Plaintiff if he had been engaging in the recommended hand exercises. *Id.*

## II.    Discussion

### A.    Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant initially bears the burden of showing that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue necessitating trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts

that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The court must credit the evidence of the non-moving party in considering the motion for summary judgment, and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of

material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

As in this case, when both parties file motions for summary judgment, the court applies the same standards of review. The Fourth Circuit has directed, "[t]o the extent that 'cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure.'" *T.H.E. Ins. Co. v. Davis*, 54 F.4th 805, 818 (4th Cir. 2022) (citing *Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021)); *see also Adjei v. Mayorkas*, 59 F.4th 659, 664 (4th Cir. 2023) ("We review cross-motions for summary judgment under the same standard, considering 'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'") (citing *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 189 n.2 (4th Cir. 2022)).

  B.  Analysis

Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983. A civil action brought pursuant to 42 U.S.C. § 1983 provides a means to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States, but the statute is not, itself, a source of substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). "Section 1983 imposes liability on

any person who, under the color of state law, deprives another person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Doe v. Kidd*, 501 F.3d 348, 355 (4th Cir. 2007) (citing 42 U.S.C. § 1983). "Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997). With the exception of Deputies and Medical Personnel, Defendants are persons who presumably acted under color of state law. Therefore, the threshold question is whether Defendants deprived Plaintiff of a right secured by the Constitution or federal law.

1.     Fourth Amendment Excessive Force Claim

Plaintiff's claim that Defendants used excessive force in apprehending him is considered under the Fourth Amendment. The Fourth Amendment directs that individuals should be free from unreasonable seizures. U.S. CONST. amend. IV. Consequently, "[t]he Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Supreme Court has directed lower courts to review Fourth Amendment excessive force cases based on the reasonableness factors set forth in *Graham.* Courts must examine "(1) the

24

'severity of the crime' that is the subject of the stop or arrest, (2) 'whether the suspect poses an immediate threat to the safety of the officer, or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Benton v. Layton*, 139 F.4th 281, 289 (2025) (citing *Graham*, 490 U.S. at 396).

The Fourth Circuit recently explained:

> The inquiry under the constitutional prong is "based on the totality of the circumstances." *Aleman*, 80 F.4th at 285 (citation omitted). "[A] court cannot . . . 'narrow' the totality-of-the-circumstances inquiry, to focus on only a single moment. It must look too . . . at any relevant events coming before." *Barnes v. Felix*, _ U.S. _, 145 S. Ct. 1353, 1360, 221 L.Ed.2d 751 (2025). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Id.* at 396– 97, 109 S.Ct. 1865.

*Id.*

Additionally, under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity ensures that "[o]fficials are not liable for bad guesses in gray areas;

25

they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Whether an officer is entitled to qualified immunity is a question of law for the court and, when there are no relevant disputed material facts, a court should rule on the qualified immunity issue at the summary judgment stage. *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) ("Ordinarily, the question of qualified immunity should be decided at the summary judgment stage.").

To resolve a qualified immunity defense, the court must (1) determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. *Id.*

Applying the *Graham* factors to the evidence before the court shows Defendants' actions were reasonable. The first of the *Graham* factors, the severity of the crime, weighs in favor of Defendants. When he arrived on the scene, Deputy Jackson observed that Victim had been shot in the back and was unresponsive. Prior to his apprehension, Plaintiff had been identified by Witness as the shooter, and this information had been conveyed to several of

26

the defendants. Therefore, Defendants reasonably concluded the crime was severe enough to require Plaintiff's seizure.

The second of the *Graham* factors, the immediate threat to officers, also weighs in favor of Defendants. Deputies Wark and Evangelista were attempting to place Plaintiff's hands in handcuffs and were reasonably concerned that the item in Plaintiff's hands could be used to injure them. Plaintiff failed to comply with Deputies Wark's and Evangelista's initial instructions to drop the item in his hands. Therefore, it was not unreasonable for Deputy Escobar to strike Plaintiff's left forearm with his flashlight to prompt him to drop the item.

Although Plaintiff disputes that he was actively resisting arrest or attempting to evade arrest by flight, the evidence available to Defendants at the time of Plaintiff's seizure indicates the third *Graham* factor was satisfied. The Supreme Court has recognized that the right to make an arrest carries with it the right "to use some degree of physical coercion or threat thereof to effect it." *Saucier v. Katz*, 533 U.S. 194, 208 (2001) (citing *Graham*, 490 U.S. at 396). Despite Deputy Jackson's instruction to remain outside room 105, Plaintiff moved away from the area as additional law enforcement officers arrived on the scene. Plaintiff's failure to follow Deputy Jackson's instruction and his movement away from the area where law enforcement officers were

27

responding could reasonably be interpreted by Defendants as an attempt to evade arrest by flight. While the bodycam video shows Plaintiff did not actively resist arrest, it also shows that he did not immediately comply with the deputies' instructions to drop the item in his hand, which reasonably led the deputies to conclude he was not completely compliant with their attempt to arrest him.

In addition, the totality of the evidence demonstrates the force Defendants used against Plaintiff was not excessive. Plaintiff alleges Deputy Escobar broke and disfigured his right wrist when he struck him with his flashlight, but the bodycam video shows that Deputy Escobar struck Plaintiff's left forearm. Bodycam video from multiple officers refutes Plaintiff's allegations that he registered complaints when Deputy Escobar struck him or in the hours thereafter.

In sum, the record evidence does not indicate that Plaintiff's Fourth Amendment rights were violated at the time of and immediately following his arrest, and Defendants are entitled to qualified immunity, as their conduct did not violate clearly established statutory or constitutional rights. Accordingly, the undersigned recommends the district judge deny Plaintiff's motion for summary judgment as to the Fourth Amendment claim and grant Defendants' motion for summary judgment, dismissing Plaintiff's excessive force claim.

2.    Claims of Deliberate Indifference

Plaintiff alleges Defendants were deliberately indifferent to his serious medical needs in the period immediately following his seizure and while he was incarcerated at SCDC. Claims brought by pretrial detainees regarding medical treatment and conditions of confinement are evaluated under the due process clause of the Fourteenth Amendment, as opposed to the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535, 537 n.16 (1979); *see also Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988). Nevertheless, "pretrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment." *Young v. City of Mount Rainier*, 238 F.3d 567, 575 (4th Cir. 2001) (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 243–44 (1983)).

The government has an obligation to provide medical care to prisoners. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' *Gregg v. Georgia*, *supra*, at 173, 96 S.Ct. at 2925 (joint opinion), proscribed by the Eight Amendment." *Id.* at 104. An Eighth Amendment claim for deliberate indifference is only supported if the prisoner "establish[es] a serious deprivation of his rights in the form of a 'serious or significant physical or emotional injury.'" *Danser v. Stansberry*, 772 F.3d 340,

346 (4th Cir. 2014) (quoting *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010)); *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013)). An injury or "condition is serious when it has 'been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity of a doctor's attention.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)). "[O]nly extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citing *Hudson v. McMillan*, 503 U.S. 1, 8–9 (1992).

"Deliberate indifference requires, at a minimum, that the defendant thought about the matter and chose to ignore it." *Clinkscales v. Pamlico Facility Medical Dept.*, 2000 WL 411 (Table) (4th Cir. 2000). "It may appear when prison officials deny, delay, or intentionally interfere with medical treatment." *Id.* (citing *McGuckin v. Smith*, 974 F.3d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997)). "[A] defendant 'acts with deliberate indifference if he had actual knowledge of the [plaintiff's] serious medical needs and the related risks, but nevertheless disregarded them.'" *Gordon*, 927 F.3d at 357 (quoting *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018)).

"[O]nce prison officials are aware of a serious medical need, they only

need to 'respond[] reasonably to the risk.'" *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 824, 844 (1994)). Consequently, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976). "Unless medical needs were serious or life threatening, and the defendant was deliberately and intentionally indifferent to those needs of which he was aware at the time, the plaintiff may not prevail." *Allen v. Darlington County Detention Center*, C/A No. 1:18-1588-BHH-SVH, 2019 WL 458472, at *2 (D.S.C. Jan. 9, 2019), *report and recommendation adopted by* 2019 WL 451124 (Feb. 5, 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Sosebee v. Murphy*, 797 F.2d 179, 182–83 (4th Cir. 1986)).

The evidence before the court fails to demonstrate that Defendants were deliberately indifferent to Plaintiff's serious medical needs at and immediately following his arrest. Plaintiff's allegations that he was denied opportunities to use the restroom and that officers dismissed his complaints of wrist pain and refused to loosen his handcuffs or obtain requested medical treatment for him are refuted by video from officers' bodycams and the interview room. Plaintiff reported to Deputy Evangelista that he had already urinated on himself by the time he was detained at 7:37 PM. The bodycam video does not include any requests from Plaintiff to use the restroom at the crime scene. Plaintiff did not

31

complain about wrist pain or request his handcuffs be loosened until Deputy Evangelista attempted to unlock the handcuffs to reposition them at 8:52 PM, nearly an hour after EMS left the scene. Plaintiff did not persist with his complaints after his hands were repositioned in front of him, as no complaints can be heard on the officers' bodycam videos or the interview room footage. Sergeant Guest immediately honored Plaintiff's only request to use the restroom. While in the interview room, Plaintiff signed documents using his right hand without complaints. In sum, the evidence neither demonstrates that Plaintiff suffered from a serious medical need during this period, nor that he engaged in any activity that would have reasonably made Defendants aware of his allegations of a serious medical need.

In addition, Plaintiff's allegation that his right wrist was injured at the time of his arrest is inconsistent with evidence from SCDC. Plaintiff failed to report any complaints of arm, wrist, or hand pain during the intake examination, and Nurse Arthur noted no injuries and normal extremities. Plaintiff did not document any complaint of pain in writing until 23 days after he was booked into SCDC.

The evidence shows that over the approximately two-year period that Plaintiff was incarcerated at SCDC, he repeatedly complained of wrist and hand pain and requested to see a bone specialist. Plaintiff's complaints were

not unfounded as x-rays and exam reports recognized an abnormality to Plaintiff's right distal radius, but they did not show an acute fracture requiring immediate treatment. SCDC was required to address Plaintiff's physical complaints, but the type and amount of medical care to be provided remained within the discretion of the SCDC medical providers. *See Brown v. Thompson*, 868 F. Supp. 326, 331 (S.D. Ga. 1994). While Plaintiff maintains that it was necessary for him to be referred to a bone specialist and to undergo a procedure to rebreak and reset his bone, he presented no medical evidence or opinion to support this assertion. The Constitution does not guarantee that a prisoner will receive the treatment of his choice. *See Thomas v. Anderson City Jail*, No. 6:10-cv-3270-RMG-KFM, 2011 WL 442053, at *3 (D.S.C. Jan. 19, 2011).

The evidence before the court refutes Plaintiff's allegation that the SCDC Defendants were deliberately indifferent to any serious physical injury and supports a finding that they adequately evaluated his complaints, confirmed that no invasive treatment was needed, and addressed his alleged pain. Plaintiff's examinations and imaging were reviewed by doctors who determined no additional intervention was necessary. Plaintiff's complaints were met with imaging and periodic examinations that failed to document any acute impairments to and continued functionality of his arms, wrists, and hands. Despite being informed by multiple medical staff members that x-rays

33

were negative, Plaintiff continued to complain of wrist and hand pain, leading medical personnel to examine him on multiple occasions, prescribe muscle relaxers and nerve and pain medications, attempt to instruct him on hand exercises and the proper way to propel his wheelchair to avoid hand cramping, and direct him to the commissary for additional pain medications.

Given the foregoing, Plaintiff has not established that Defendants were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment. Defendants are entitled to qualified immunity, as their conduct did not violate clearly-established statutory or constitutional rights. Accordingly, the undersigned recommends the district judge deny Plaintiff's motion for summary judgment as to the Fourteenth Amendment claim and grant Defendants' motion for summary judgment, dismissing Plaintiff's deliberate indifference claim.

III.   Conclusion and Recommendation

In light of the foregoing, the undersigned recommends the district judge deny Plaintiff's motion for summary judgment [ECF No. 94] and grant Defendants' motion for summary judgment [ECF No. 102], dismissing the action with prejudice. The undersigned further recommends the court dismiss Deputies and Medical Personnel as defendants because they do not qualify as "persons" under 42 U.S.C. § 1983 and were not served with copies of the

34

summons and complaint as required pursuant to Fed. R. Civ. P. 4.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

November 20, 2025                          Shiva V. Hodges
Columbia, South Carolina          United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

35

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).